## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | | |
|---|---|---|
| **DONALD JENKINS** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | Civil Action No: <u>1:18-cv-1152-LO/ JFA</u> |
| | ) | |
| | ) | |
| **EQUIFAX INFORMATION** | ) | |
| **SERVICES, LLC.** | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Donald Jenkins, by and through counsel, brings this Complaint against Defendant Equifax Information Services, LLC. ("Defendant" or "Equifax") on the grounds and in the amounts set forth herein:

### Preliminary Statement

1.      Mr. Jenkins maintained a pristine credit record for years until Equifax began reporting a Chase trade line that was demonstrably inaccurate and clearly misrepresented how Mr. Jenkins handles his financial affairs.  Despite the fact that Mr. Jenkins had made all his automobile lease payments on time to Chase for the original thirty-six-month term as well as seven additional ones thereafter and was still making payments, Chase abruptly decided to charge off his lease account in December 2015 and claim that he owed Chase more than $45,000.  Because Equifax reported the fact that this account for more than four years as paid on time and never late, it should have been obvious to Equifax that an abrupt charge-off by Chase made little sense.  There were multiple red flags that would have alerted any CRA to the fact that this trade line was inaccurate or unverifiable, but because Equifax outsourced the reinvestigation to a third-party that paid no

attention to all the obvious indicators, it made no effort to investigate and correct the trade line.  In addition to being a never late/charge-off, Chase reported that Mr. Jenkins owed $45,126 while he was still in possession of the vehicle, told him he could purchase the vehicle for $45,126 and still reported that he owed $45,126 after Chase reclaimed possession of the vehicle.  It should have been beyond obvious to Equifax that if Chase claimed he owed $45,126 before it reclaimed possession of the vehicle, that it could not still be reporting that same balance ten months after it recovered possession of the vehicle.  Equifax utterly failed in its duty as a CRA to verify and correct disputed account data, allowed a demonstrably wrong trade line to remain on Mr. Jenkins' credit file, and shut off all access to credit for Mr. Jenkins.  His credit rating tumbled so far because of this erroneous charge-off that he was denied when he applied for a small in-store credit line at a J.Crew check-out register while holiday shopping. Accordingly, Mr. Jenkins requests an award of actual damages, statutory damages, punitive damages, attorney's fees and costs based upon Equifax's violation of the Fair Credit Reporting Act 15 U.S.C. §1681 *et seq*.

## Parties

2.      Plaintiff Donald Jenkins is a "person" and "consumer" as defined by the FCRA at 15 U.S.C. §1681a(b) and (c) because he is an individual.  Unless otherwise specifically stated herein, the term "Plaintiff" shall refer to Donald Scott Jenkins.

3.      Defendant Equifax Information Services LLC, (hereinafter "Equifax"), is a consumer reporting agency, as defined in section 1681(f) of the FCRA, regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing consumer reports, as defined in section 1681a(d) of the FCRA, to third parties. Equifax regularly conducts these business activities in the Eastern District of Virginia by

providing credit reports and other products to consumers and businesses in the Alexandria division of the Eastern District of Virginia.

<strong><u>Jurisdiction &amp; Venue</u></strong>

4.       This court has jurisdiction pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §1681(p).  Venue is proper in this jurisdiction.  Plaintiff resides in the Eastern District of Virginia and that forum is the most convenient for the adjudication of his claims.

<strong><u>Factual Allegations</u></strong>

5.       Mr. Jenkins entered into a thirty-six month lease of a Range Rover automobile through Chase Auto in 2012.  He made all 36 payments on time and completed the lease as of June 2015.  During the lease term, Chase had been paying personal property taxes on this vehicle to both Alexandria and Fairfax and then double billed Mr. Jenkins for the taxes. Mr. Jenkins brought the tax issue to Chase's attention, it acknowledged the issue and a representative from Chase instructed Mr. Jenkins not to pay the taxes, keep making the regular monthly payments and allow it some time to sort out the tax problem.

6.       At the conclusion of the original thirty-six-month lease term, the parties agreed to extend the lease for five additional months.  Mr. Jenkins tendered all of these payments as well, but Chase still had not resolved the tax issue.

7.       As the lease extension came to a close, Mr. Jenkins contacted Chase Auto to determine what the payoff amount would be to purchase the vehicle since the numbers should have changed due to the additional term and payments.  Chase could not provide him with a payoff figure because it still had not resolved the personal property tax issue.  However, Chase continued to send him monthly invoices after the extension term expired, and Mr. Jenkins continued tendering payments on the account.

3

8.     On December 31, 2015, Chase Auto abruptly and unilaterally decided to charge-off the entire account balance it believed was due on the account, but made no mention of its actions to Mr. Jenkins.  Four days after Chase charged off the lease, Mr. Jenkins tendered yet another monthly lease payment that Chase accepted and posted.  Chase placed the whopping charge-off amount of $45,126 on Mr. Jenkins' credit report. That amount was demonstrably inaccurate for multiple reasons: a) it included the full balance for the double billed taxes that Chase had failed to resolve; b) it included an undisclosed amount for the value of the vehicle despite the fact that Mr. Jenkins had leased the vehicle and had no continuing obligation under the terms of the lease after he had tendered all the monthly installments; and c) it indicated that a lease that had been paid timely, never late, was now suddenly charged off as a bad debt.

9.     Mr. Jenkins was prepared to write a check to purchase the vehicle, but he never received a price from Chase, much less one that took into consideration the additional seven payments he tendered as well as the additional depreciation.  In February 2016, Chase located the vehicle at Mr. Jenkins' residence and recovered its property by repossession.

10.     After the repossession, Mr. Jenkins worked with Chase to try and resolve the issue, but it stubbornly refused to do anything other than demand that he pay the grossly inflated figure of $45,126 and for that sum he could keep the vehicle. Not only did Mr. Jenkins reach out to Chase, but the chief operating officer for the Don Beyer dealership that leased him the vehicle tried as well and so did an attorney in Richmond.  Nothing about the situation made sense, and what Equifax was reporting on his credit file was not indicative of how Mr. Jenkins handles his credit.

11.     In a letter dated, February 26, 2016, Chase acknowledged that it had the vehicle and represented that he could purchase it from Chase for $45,126.  In light of the fact that the residual purchase value in the lease after the initial thirty-six months was $36,037 and the fact that

he had tendered seven additional payments of $1,021 plus the fact that the vehicle had depreciated significantly since June 2015, the purchase price should have been around $30,000 plus what actual amount of personal property taxes he owed.  Obviously, Mr. Jenkins had no interest in purchasing that vehicle for such an inflated price.  Chase further stated in the February 26th letter that if he did not agree to purchase the vehicle for $45,126 that Chase would sell the vehicle and that Mr. Jenkins would be responsible for the deficiency balance.  The letter provided no accounting or explanation as to how Chase reached that $45,126 number, why he would owe Chase anything for the vehicle after he had made all the payments, how Chase calculated whatever value it assigned to the vehicle, what portion of the double taxes that Chase had paid that were his responsibility or what other charges he might owe. As it turned out, even years later Chase still could not provide a reasonable accounting or explain how it reached that $45,126 number.  From the time of the February 26, 2016 letter forward, Chase would not send Mr. Jenkins a bill or letter regarding the vehicle, which left him wondering what if anything Chase claimed that he owed on the account.

12.     Because Chase knew what it had done and what it was reporting to the CRAs was insupportable, it froze and decided to do nothing from that point forward.  The vehicle had been shipped to the Manheim Auto Auction, but Chase would not allow it to be sold.  Additional funds were received by Chase for tax refunds on that vehicle and Mr. Jenkins' final payment in January 2016 posted to the account, yet they never reported those credits to the CRAs as a basis for a reduction in the balance due.  As a result, for the next ten months, Chase continued to falsely represent that Mr. Jenkins had defaulted on his lease and owed Chase $45,126.

13.     Having tried to work things out with Chase and getting no response, Mr. Jenkins decided to dispute the misleading and inaccurate credit reporting information with the credit

5

reporting agencies including Equifax.  On September 21, 2016, Mr. Jenkins sent to Equifax a credit dispute package that included a detailed credit dispute letter, a copy of how Equifax reported the Chase account, a copy of letters from Chase, and proof that he had made payment on the loan as late as January 4, 2016.  Mr. Jenkins' dispute letter provided a detailed description of the circumstances including notations that he had paid all the regular lease payments on time including seven additional payments.  Mr. Jenkins' pointed out in his letter the most obvious proof that what Chase was reporting could not be accurate: a) it was a lease and because of that he did not owe Chase for the value of the vehicle at the end of the lease term after he had made all the payments and b) even if Chase believed he did, he was entitled to a credit for the value of the vehicle after Chase recovered it.  On its face what Chase was reporting made no sense at all, but Equifax refused to review his dispute properly and simply parroted whatever Chase wanted to report.

14.     The September 21, 2016 credit dispute letter also included a request for the full explanation of what Equifax did to reinvestigate the dispute, because Mr. Jenkins knew that if Equifax refused to correct the credit reporting that Equifax could not have conduced any sort of reinvestigation.

15.     Based upon information and belief, Equifax failed to conduct any independent reinvestigation and simply issued an ACDV to Chase after it received Mr. Jenkins' credit dispute package.  Thereafter on October 10, 2016, Equifax provided the results of the reinvestigation by allowing the derogatory charge off status to remain and slightly lowering the $45,126 balance to $41,051 on the Chase trade line.  This credit reporting continued to make no sense, yet Equifax agreed to publish it.   If Equifax had conducted a reasonable reinvestigation with Chase, it could have discovered that Chase had provided no credit for the value of the vehicle despite its representation in the February 26th letter that it would, included inaccurate tax charges in the total

amount owed, and Chase had no reasonable explanation as to why Mr. Jenkins was suddenly charged off or how it calculated that amount due. Accordingly, Equifax reported inaccurate and misleading information without conducting a reasonable reinvestigation of the dispute.

16. In the October 10, 2016 response, Equifax did not provide a description of how it reinvestigated Mr. Jenkins dispute despite his specific request in the September 21, 2016 credit dispute package that it do so. Based upon information and belief, Equifax routinely fails to comply with its obligation to provide the consumer with a description of what it did to reinvestigate the particular dispute as required by §1681i(a)(7). In this particular case, Equifax failed to disclose what it did to reinvestigate this dispute, because it did virtually nothing other than issue an ACDV to Chase and parrot whatever response Chase provided.

17. In follow-up to his first dispute letter, Mr. Jenkins sent a second credit dispute package to Equifax dated December 8, 2016. The second dispute letter informed Equifax how he never received a pay-off figure for the lease from Chase prior to the time that it charged-off the account as required by the lease. In fact, if Equifax had conducted an independent investigation it would have seen Chase account notes indicating that Mr. Jenkins had contacted Chase to receive a pay-off, but Chase refused to provide the pay-off because of the issue related to the double billing for personal property taxes for the vehicle. Mr. Jenkins' letter went on to note how the lease provisions did not allow it to calculate a past due balance in the fashion Chase did and that Chase still failed to account for the fact that Chase had retaken possession of the vehicle, yet still reported the original charge-off balance. As part of his credit dispute package, Mr. Jenkins included a copy of the letter that extended the lease term and a copy of the lease.

18. Unbeknownst to Mr. Jenkins, Chase finally sold the vehicle between the time that he sent the December 2016 dispute letter and Equifax's response on January 5, 2017. If Equifax

had done more than issue an ACDV after receiving the second credit dispute letter, it would have discovered that Chase waited ten months to finally dispose of the vehicle, so that it was always inaccurate and misleading to report that Mr. Jenkins owed over $40,000 throughout the 2016 calendar year. Based upon how it simply issued an ACDV and thereafter relied upon the furnisher Chase, Equifax recklessly violated the FCRA by not reviewing, considering, and verifying the information that it reported about Mr. Jenkins' account with Chase.

19.     Equifax ignored multiple red flags that would have caught the eye of any reasonable person reinvestigating this dispute. The only way that could happen and did happen is because of how Equifax processed the disputes. Rather that instruct someone reliable to reinvestigate and examine what Mr. Jenkins said in his dispute letter and what his attached documents demonstrated, it decided to outsource the work to low-paid subcontractors that did the bare minimum and even refused to respond to Mr. Jenkins' request for an explanation of what Equifax did. This was no accident, but rather the foreseeable result of a system that is designed to put profits over people.

20.     On January 5, 2017, Equifax sent the results of the reinvestigation that continued to report inaccurate and misleading information about the account. First, Equifax reported that the amount past due was $19,576, which was inaccurate and misleading. Next, Equifax reported in the historical account information section payments that did not correspond to payments that Mr. Jenkins made on the account, which is further proof that Equifax maintained faulty data about the account. Equifax also failed to tell Mr. Jenkins what it did to conduct its reinvestigation, just as it had failed to do after the first dispute letter.

21.     Mr. Jenkins wanted to use his credit to refinance the mortgage on his home and to purchase a vacation home in the Outer Banks of North Carolina. Based upon information and

8

belief, the presence of Equifax's reporting the charge-off Chase account was a substantial factor in his inability to either refinance his mortgage or purchase a second home.

22.     Mr. Jenkins continued to seek credit periodically, and he was also denied for a simple in store credit card at J.Crew. He also could not purchase another vehicle at the interest rates that he otherwise would have expected to purchase given his previous stellar credit history. As a result, he suffered actual damages, emotional distress, and loss of access to credit.

## COUNT I
### Fair Credit Reporting Act
### 15 U.S.C. §1681i

23.     Plaintiff incorporates paragraphs one (1) to twenty-two (22) as if fully stated herein.

24.     Defendant Equifax has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA.  Equifax is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681i by failing to comply with the enumerated statutory provisions when Mr. Jenkins disputed the Chase Auto account as part of his two dispute letters.

25.     Equifax violated 15 U.S.C. §1681i(a)(1) by its conduct related to Mr. Jenkins credit dispute packages that it received in September 2016 and December 2016.  Equifax failed to review and consider the information included in the letter and conduct a reasonable reinvestigation on both occasions.  Equifax simply issued ACDVs with no regard for the circumstances that Mr. Jenkins informed them of the problem, provided proof that he paid additional payments on the lease, and ultimately provided the lease itself.  Equifax would never directly contact Chase to inquire as to the total circumstances and never considered Mr. Jenkins' position, which resulted in misleading and inaccurate credit reporting.

26.     The FCRA requires that in conducting its reinvestigation under 15 U.S.C. §1681i(a)(1)(A) that a credit reporting agency must delete information about a consumer unless it is able to verify said information as stated in 15 U.S.C. §1681i(a)(5)(A):

> In general If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or **cannot be verified**, the consumer reporting agency shall- (i) promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and (ii) promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer.  15 U.S.C. §1681i(a)(5)(A) (emphasis added)

27.     According to Black's Law Dictionary, the ordinary meaning of verify is, "to prove to be true; to confirm or establish the truth or truthfulness; to authenticate."  Based upon the information provided in the dispute letter, Equifax could not have met the high bar of verification necessary to allow the Chase Auto accounts to remain on Mr. Jenkins' credit report after the September 2016 dispute letter because of the additional information and factual detail he provided about the circumstances surrounding the completion of the lease.

28.     Equifax also violated 15 U.S.C. §1681i(a)(1)(A) after receiving the December 2016 credit dispute letter because Mr. Jenkins provided  further description regarding how the balance still reflected the inaccurate balance of over $40,000 despite the fact that Chase Auto had retained possession of the vehicle since February of 2016.

29.     Equifax also violated 15 U.S.C. §1681i(a)(4) after receiving Mr. Jenkins' disputes in September 2016 and December 2016 because it failed to review and consider all relevant information that Mr. Jenkin provided about the lease and simply relied on the ACDV process.

30.     Equifax also violated 15 U.S.C. §1681i(a)(7)  when it failed to provide a description of the reinvestigation procedure used by Equifax as part of his request in the two disputes.  Equifax should have provided the description, so Mr. Jenkins could determine what process, people, and

documents that Equifax used to determine whether it could verify the information reported about the account.

31.     Punitive damages are warranted for Equifax's actions based on the totality of the circumstances.  Equifax knew the Chase Auto account was an auto lease with a fixed term that had never been late up to December 2015.  The credit reporting never made sense to have the major date of delinquency also be December 2015 with a charge-off in the amount of $45,126.  The circumstances of the credit reporting did not support the charge-off reported.   In addition, from the dispute letters, Equifax knew that Mr. Jenkins had tendered additional payments, Chase Auto took the car, yet Chase Auto continued to report a substantial charge-off.  Equifax should have done more than rely on the ACDV exchange and in fact if it had done more could have discovered how Chase Auto waited to sell the car, never communicated a pay-off figure when Mr. Jenkins requested it before the initial charge-off, and never could verify the total amount owed because of the double taxation of the personal property taxes.

32.     Mr. Jenkins suffered actual damages including time spent addressing the problem, improper denial of access to credit, inability to obtain a loan and emotional distress damages.  In addition, punitive damages are necessary based upon Equifax's reckless disregard for reviewing information submitted by consumers and issuing ACDVs.

## COUNT II
## Fair Credit Reporting Act
## 15 U.S.C. §1681e(b)

33.     Plaintiff incorporates paragraphs one (1) to thirty-three (33) as if fully stated herein.

34.     Defendant Equifax has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA.  Equifax is liable to the plaintiff for damages under 15 U.S.C. §1681n

and §1681o because it violated 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the plaintiff's credit report.

35.     Equifax willfully and/or negligently violated the Fair Credit Reporting Act at 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of information reported about Mr. Jenkins.

36.     Equifax's publishing of the inaccurate information was a substantial factor in the denial of credit to Mr. Jenkins when he applied for a loan with PNC Bank, NA on July 17, 2017. Additional discovery is necessary to determine other entities that Equifax's credit report was a substantial factor in the denial of credit to Mr. Jenkins.

37.     Mr. Jenkins suffered substantial damages including: the denial of credit, loss of time working to restore his credit; inability to obtain a loan to refinance his home or purchase a beach home, and emotional distress caused by Equifax's violations of the FCRA.

38.     Punitive damages are necessary because Equifax has implemented a system and process that it knows results with inaccurate credit reports being sold to furnishers because Equifax fails to invest the resources into enacting procedures to protect consumers. Equifax has implemented procedures to allow inaccurate data to remain in its system that cannot be verified if reinvestigated properly.  Only punitive damages can curb this type of conduct that operates in reckless disregard for accurate credit reports.

### Prayer for Relief

Wherefore, the Plaintiff prays that the Court award the following relief:

a)      Actual damages based upon Defendant's violations of the FCRA;

b)      statutory damages against Defendant's based upon violations of the FCRA;

c)      punitive damages based upon the violations of the FCRA

d)      costs and reasonable attorneys' fees incurred by the Plaintiff;

e)      prejudgment interest

f)      all other further relief that this Court deems just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury as to all issues against all defendants.

Respectfully submitted
Donald Jenkins

By: Counsel

A. Hugo Blankingship, III, VSB 26424
Thomas B. Christiano, VSB 43940
Blankingship & Christiano, P.C.
11790 Sunrise Valley Dr. Suite 103
Reston, Virginia 20191
(571) 313-0412
Fax:(571) 313-0582